lml

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Case No. 02-40157-01-JAR |
| | ) |
| TROY BARKER, et al., | ) |
| | ) |
| Defendant | ) |
| | ) |

### MEMORANDUM AND ORDER DENYING DEFENDANT'S MOTION FOR RELEASE OF BOND PROCEEDS AND MOTION TO QUASH RESTRAINING ORDER

Defendant Troy Barker has assigned his interest in bond proceeds in the amount of $500,000 to the law firm of Ross & Sousley for payment of attorney fees and expenses in representing defendant in these criminal proceedings. Before the Court is defendant's Motion for Release of Bond Proceeds (Doc. 301), which are currently held in the Court's registry. On July 18, 2005, the government filed an *ex parte* application for post-indictment restraining order (Doc. 313), asserting that the bond proceeds represented the remaining equity in defendant's real property, which the government alleges is subject to forfeiture. On July 22, 2005, the Court entered an order restraining transfer of the bond proceeds (Doc. 323). Barker subsequently filed a Motion to Quash Restraining Order, or, in the Alternative, Request for *Jones* Hearing (Doc. 340). The government responded (Doc. 348), and a hearing was conducted on August 26, 2005. Upon counsel for Barker's representation that their principle witness, Harry Sutherland, was en route, the Court continued the hearing to August 29, 2005. After hearing proffer and arguments of counsel, the Court took the matter under advisement. The Court has reviewed the submissions

of the parties and is ready to rule. For the reasons set forth below, defendant Barker's motions are denied.

### *Background*

Defendant Barker was arrested on December 30, 2002, and charged with one count of possession with intent to distribute 225 kg of marijuana; there was no forfeiture count in the Information. Magistrate Judge O'Hara conducted a detention hearing on December 31, 2002. The notes from the bond hearing indicate that Barker was to obtain a loan for a cash bond secured by a $500,000 mortgage on his recording studio. Judge O'Hara also required Barker to post a surety bond. At the detention hearing, former defense counsel Cornell Price represented that defendant could get a mortgage on his recording studio, which was allegedly worth approximately $1 million. Judge O'Hara denied the government's motion for detention, but remanded defendant to custody until he could obtain the mortgage to secure the cash bond.

The Order Setting Conditions of Release for the defendant (Doc. 34) sets forth the same conditions expressed orally by Judge O'Hara at the detention hearing. Paragraph seven of that Order requires:

> The defendant shall:
> . . . .
>
> (b) execute a bond or an agreement to forfeit upon failing to appear as required the following sum of money or designated property: $500,000 cash to be deposited with Clerk of the Court.
>
> (c) post with the court the following indicia of ownership of the above-described property, or the following amount or percentage of the above-described recording studio valued at $1,000,000 subject to an existing $100,000 mortgage, plus a $500,000 second mortgage to borrow $500,000 for cash surety bond.

Thereafter, it took some time for Barker to obtain the mortgage required by Judge O'Hara. On April 11, 2003, Barker posted a cash bond of $500,000.

On November 6, 2003, the government filed a Second Superseding Indictment that sought criminal forfeiture of various property, and specifically listed under "substitute assets" the $500,000 bond. Barker was ordered detained pending trial (Doc. 122). The $500,000 remains in possession of the Clerk of the Court.

On April 20, 2005, a Third Superseding Indictment was filed, which omitted the bond money as a substitute asset. The Third Superseding Indictment lists specific real property, including 5739 Tujunga Ave., North Hollywood, CA, (the "Tujunga property"), owned by Barker, valued at $650,000, as well as 22523 Summit Ridge Circle, Chatsworth, CA, owned by Barker, valued at $1.4 million. The government asserts that the Tujunga property is in fact, Barker's recording studio. There is also a general provision for substitute assets, which does not list the bond or any other specific property.

Defendant Barker assigned the bond proceeds to present counsel Ross & Sousley on June 27, 2005, and filed a motion for release of bond proceeds. The government did not respond directly to the motion, but instead filed an *ex parte* application for post-indictment restraining order, which the Court granted on July 22, 2005. The application for restraining order alleges that the Third Superseding Indictment seeks criminal forfeiture of the Tujunga property as both a proceed and an instrumentality of the underlying drug trafficking offenses. The application further alleges that on March 20, 2003, Barker obtained a $500,000 mortgage on the Tujunga property, which was later sold through private sale to avoid foreclosure. The government asserted that the $500,000 represents the equity in the Tujunga property and is therefore subject

to criminal forfeiture under 21 U.S.C. § 853.

On August 29, 2005, the government filed a Bill of Particulars, providing notice that it was seeking forfeiture of additional property, specifically the $500,000 bond money.

*Discussion*

Barker moves to quash the restraining order or, in the alternative, requests a hearing pursuant to *United States v. Jones*.[1]  Barker raises three issues in his motion, which the Court will address in turn.

**1. Law of the Case**

Barker relies on the "law of the case" doctrine as foreclosing the restraining order on the bond money that: had been approved by Judge O'Hara as "untainted" bond money; was never listed as forfeitable property; and was deleted as substitute assets in the Third Superseding Indictment.

The government responds that the issue of whether this money is properly subject to restraint was not resolved by or through the mechanisms cited by Barker.  First, neither Judge O'Hara's comments at the detention hearing nor the Order Setting Conditions of Release include or constitute a finding that the bond money was "untainted."  Although the government did not at that time challenge the legitimacy of the funds based on information it had at the time, defendant has cited no authority that the government has waived its right to challenge the legitimacy of the funds.  Second, although the bond money was not listed as forfeitable property in any indictment, the money is directly traceable to the Tujunga property, which was named in the various indictments.  Third, the bond money does not constitute substitute assets, as

---

[1] 160 F.3d 641 (10th Cir. 1998).

discussed below; the fact that it was not listed as substitute assets in the third superseding indictment is irrelevant.

"When a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."[2] At the time Judge O'Hara held the detention hearing and entered the release order, there was no forfeiture count pending against Barker. The Court declines to characterize Judge O'Hara's order setting conditions of release as a decision upon a rule of law.

### 2. Substitute Assets

Barker argues that the bond money is not forfeitable because it constitutes substitute assets, for which pretrial restraint is not authorized. The Tenth Circuit has not specifically addressed whether substitute assets are subject to pretrial restraint under 21 U.S.C. § 853(e)(1)(A). The Third, Second, Fifth, Eighth and Ninth circuits do *not* permit pretrial restraint of substitute assets;[3] the Fourth Circuit allows the pretrial restraint of substitute assets, but also requires a hearing if the restraint involves a portion of funds that are untainted.[4] The Seventh Circuit has held that assets can be seized pretrial and that no hearing is required unless the defendant can show a bona fide need to use the funds to obtain counsel.[5] The government concedes that the majority of courts have held that substitute assets are not subject to pretrial

---

[2] *Arizona v. California*, 460 U.S. 605, 618 (1983).

[3] *United States v. Panelidis*, 355 F.3d 226 (3rd Cir. 2003); *United States v. Gotti*, 155 F.3d 144 (2nd Cir. 1998); *United States v. Floyd*, 992 F.2d 498 (5th Cir. 1993); *United States v. Riley*, 78 F.3d 367 (8th Cir. 1996); *United States v. Ripinsky*, 20 F.3d 359 (9th Cir. 1994).

[4] *United States v. Farmer*, 274 F.3d 800 (4th Cir. 2001).

[5] *United States v. Kirschenbaum*, 156 F.3d 784 (7th Cir. 1998).

restraint, and that the Tenth Circuit has not addressed the issue. The government submits that this issue is irrelevant, as the $500,000 in question does not constitute substitute assets.

"Substitute assets" are those which are not involved in the alleged crimes and are not traceable to property involved in the crimes; they are unconnected to the charges at issue in a criminal case.[6] Barker argues that the bond money is not forfeitable because it is not derived from the criminal activity charged. Instead, Barker argues it constitutes substitute assets, focusing on the Second Superseding Indictment, which listed the bond money as such. The government has admitted, however, that this was an error that was corrected in the Third Superseding Indictment, which controls these proceedings.

The government contends that the $500,000 bond is directly connected with and traceable to the alleged crimes. The government alleges that the origin of the money is clear--it is derived from the mortgage obtained on Barker's recording studio located at the Tujunga property, as directed by Judge O'Hara. The $500,000 represents the equity, value or both of the recording studio and equipment. United Providence Funding loaned Barker the money and secured it with a $175,000 second mortgage/deed of trust dated March 20, 2003 on the studio and a security interest in the equipment for $325,000. Thus, under § 853, the bond money is derived from the recording studio and equipment, which constitute alleged proceeds from the drug conspiracy, and is therefore forfeitable. Proceeds are proceeds, the government argues, even when they change form.

The Court agrees with the government. Under § 853, a defendant shall forfeit property "constituting or derived from any proceeds the person obtained, directly or indirectly, as the

---

[6] 21 U.S.C. § 853(p).

result of such violation." The bond money was obtained through a loan secured by the recording studio/Tujunga property and the recording equipment; the real estate was specifically listed in the forfeiture count, which also sought "any and all" property constituting or derived from proceeds of the underlying offenses. Barker argues that since the money is not directly derived from the criminal activity, it is not forfeitable. This is not the standard, however, as § 853 states property derived from any *proceeds* the person obtained, directly or indirectly from the criminal activity is subject to forfeiture. If the recording studio is forfeitable, then a loan obtained from a mortgage on the property would surely be derived from the recording studio. By contrast, an example of substitute assets would be where the jury found that the recording studio was forfeitable; the recording studio subsequently burned down; and the government sought forfeiture of defendant's car or jewelry instead, up to the value of the recording studio. Of course, this is a legal determination for the court.[7]

### 3. Request for *Jones* Hearing.

The restraining order at issue was obtained by the government pursuant to 21 U.S.C. § 853(e). The purpose of § 853(e)(1)(A) is to preserve assets and assure the availability of property pending disposition of the criminal case.[8] Congress mandated that § 853 be "liberally construed to effectuate its remedial purposes."[9] The Supreme Court decision in *United States v. Monsanto*[10] clarified that § 853(e) authorizes a district court to enter a pretrial order freezing or

---

[7] *Id.*

[8] *Jones,* 160 F.3d at 647 (citation omitted).

[9] 21 U.S.C. § 853(o).

[10] 491 U.S. 600 (1989).

restricting transfer of assets of the defendant, even where the defendant desires to use those assets to employ an attorney; such relief granted to the government does not violate the Sixth Amendment. The Tenth Circuit subsequently held in *Jones* that a hearing to challenge a § 853(e) post-indictment restraining order should not be held unless a defendant makes (1) a preliminary showing that he has no other assets, other than those restrained, with which to retain private counsel and provide for himself and his family; and (2) a prima facie showing that the grand jury erred in its forfeiture provisions of the indictment that the restrained assets are not proceeds, or traceable proceeds, of the charged offenses.[11] If a defendant makes the requisite showing, due process requires a hearing at which time the government must establish probable cause to believe that the restrained assets in fact constitute or are derived from proceeds of the underlying offense.[12] At such a hearing it is clear that the rules of evidence do not strictly apply, similar to TRO or preliminary injunction hearings.[13] It is also clear that the government is not required to reestablish probable cause of guilt as to the underlying offense.[14]

### *Need*

As to the first prong of the *Jones* prerequisites, the defendant has the burden of persuading the court that he has no funds from which to retain counsel of his choosing or to support himself or his family.[15] Barker submitted an affidavit at the August 29, 2005 hearing as

---

[11]*Jones*, 160 F.3d at 647.

[12]*Id*.

[13]*Id.* at 647-48.

[14]*Id.*

[15]*Id.*

to his financial need, which avers that he has no other funds from which to pay counsel or support his family, that the majority of his assets have been restrained pursuant to the restraining order obtained by the government or seized and liquidated, and that his remaining personal belongings have been sold to pay storage bills.

Barker does not itemize his income and expenses nor discuss any other sources of funding, such as his wife or family. Indeed, the government contends that Barker has not accounted for any of the other assets that have not been seized by the government, such as "about $59,000 in savings" that former counsel Kurt Kerns represented defendant had at the detention hearing, or the "$56,000 right now in an account in Los Angeles" that formal counsel Cornell Price represented the defendant had at the detention hearing. The government argues that defendant has also not accounted for any of the retainers that he has previously paid counsel in this case, which total over $100,000. The government offered evidence at the hearing relative to defendant's house, furnishings and activities of various bank accounts.

Barker counters that he has paid former counsel $100,000, and owes counsel over $80,000. He also contends that any furniture and personal belongings not already sold are worth little, and that the numerous bank accounts cited by the government have no funds. Because Barker's proffer regarding the sources and whereabouts of his assets leaves much to be desired, the Court is not entirely persuaded by his claim that he has no funds from which to retain counsel of his choosing or to support himself or his family need. In light of its finding that there is no evidence that the grand jury erred, however, the Court declines to analyze Barker's exceedingly

inconsistent and incredible evidence concerning his financial affairs.[16]

### *Grand Jury Error*

As for the second prong, defendant must present a bona fide reason to believe the grand jury erred in determining that the restrained assets are subject to forfeiture.[17] The defendant has the burden of production of evidence that would lead the court to believe that there are assets that should not be burdened by the restraining order.[18] The key to whether property is forfeitable is whether it constitutes or is "derived from" proceeds of the offense. "Derived from" means money or other property obtained directly or indirectly using money or any other source of wealth gained as a result of the offense. "Facilitation occurs when the property makes the prohibited conduct 'less difficult or more or less free from obstruction or hindrance.'"[19]

Barker argues that because the grand jury did not specifically seek forfeiture of the $500,000 bond, this threshold burden of production has been met. The Court disagrees. Although the Third Superseding Indictment does not specifically reference the $500,000 bond, it does reference defendant's Tujunga property, which served as his recording studio. The fact that the $500,000 itself was not indicted is irrelevant because the money is derived from the Tujunga property, which was indicted. There appears to be no question that the bond money was derived from this property, which served as collateral for the cash bond.

---

[16]For example, to explain high levels of activity in certain bank accounts as well as the source of funds for his retainer to Cornell Price, Barker proffered that he was the producer, writer, or both for the recent hit movie "Beauty Shop," starring Queen Latifah.

[17]*Jones*, 160 F.3d at 647-48.

[18]*Id.*

[19]*Id.*

Nor is there any reason to question the grand jury's determination that the property from which the bond money was derived, the Tujunga property, is subject to forfeiture. Despite counsel's representation at the August 26, 2005 hearing that Harry Sutherland would testify regarding Barker's business income, he presented no evidence that the recording studio was a legitimate business. Instead, Barker argued at the August 29, 2005 hearing that the grand jury had made "obvious" mistakes. Specifically, defendant contends that (1) it was error for the grand jury to have indicted the $500,000 bond money as substitute assets in the Second Superseding Indictment; (2) it was error to indict the Tujunga property as defendant does not own the property, which was being purchased on a contract for deed; and (3) there is no claim for the recording equipment in any of the indictments.

None of these arguments has merit. First, the government has conceded that it was error to list the bond money as a substitute asset in the Second Superseding Indictment, an error that was corrected in the Third Superseding Indictment. Moreover, the issue of whether property constitutes a substitute asset is exclusively for the court, not the jury. Second, contrary to defendant's assertion, purchasing real property on a contract for deed is not the equivalent of renting the property. The loan documents provided by the government demonstrate that defendant in fact owned the Tujunga property. Finally, the government has filed a Bill of Particulars specifically notifying Barker that it seeks forfeiture of additional property, specifically the $500,000 bond proceeds held in the Court's registry. This, coupled with the language in the Third Superseding Indictment seeking forfeiture of "any and all property" constituting or derived from proceeds obtained directly or indirectly as a result of the offenses charged, and "any and all" property used to commit or facilitate the commission of the offenses,

encompasses both recording studio and equipment, as well as the bond money derived therefrom.

Accordingly, the Court finds that defendant has not sustained his burden of production of evidence that would lead the Court to believe that there are assets that should not be burdened by the restraining order.[20] Because the defendant has not made his threshold showing on the second prong, due process does not require a hearing at which the government may establish probable cause to believe that the restrained assets are in fact traceable to proceeds of the underlying offense.[21] The restraining order shall remain in force and effect, and defendant's motion for release of bond proceeds is denied.[22]

In so ruling, the Court notes that the criminal justice act provides a method for the Court to insure that Barker has the continuity of counsel in this case, who entered an appearance in June 2005.[23] Under the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A(c), a trial court has jurisdiction to appoint a defendant's previously retained counsel.[24] The CJA also provides for investigative and expert witness expenses, and fees in excess of specified maximums for appointed counsel for indigent defendants if there has been extended or complex

---

[20]*Id.*

[21]*Id.*

[22]Defendant argues alternatively that the motion for release of funds should be granted by default, since the government did not respond with a motion in opposition within ten days, instead filing an *ex parte* application for restraining order 19 days after defendant's motion. This argument is without merit. Although D. Kan. Local Rule 6.1(d)(1) provides that responses to nondispositive motions shall be filed within 14 days, it is not clear whether the rule applies to motions in criminal proceedings, nor is there any provision for default upon a tardy response. Although it would have been preferable for the government to have acted in a more timely fashion in filing its application, the Court will construe the *ex parte* application as a response to defendant's motion for release of bond funds.

[23]Barker has had three previous counsel in this matter: Kurt Kerns, Cornell Price and Robin Fowler.

[24]*U.S. v. Iles*, 906 F.2d 1122 (6th Cir. 1990).

representation.[25]  Although the Court's order denying Barker's motion to quash the restraining order denies him access to the bond money as a source of payment of retained counsel, it does not necessarily deny him representation by that counsel.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant Barker's motion for release of bond funds (Doc. 301) and motion to quash restraining order and request for *Jones* hearing are DENIED.

IT IS SO ORDERED.

Dated this  26th  day of September 2005.

          S/ Julie A. Robinson
          Julie A. Robinson
          United States District Judge

---

[25] 18 U.S.C. § 3006A(d)(3), (e).